UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN PROTECTION & ADVOCACY
SERVICE, INC.,

                Plaintiff,                      Case Number 15-12470

v.                                          Honorable David M. Lawson

FLINT COMMUNITY SCHOOLS and
LARRY WATKINS, JR.,

                Defendants.

_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

This is a lawsuit filed by the plaintiff — a state-authorized advocacy group that advocates on behalf of mentally ill, physically disabled, and developmentally disabled students — to obtain records of their client/students from the Flint Community Schools. Presently before the Court is the plaintiff's motion for a preliminary injunction to compel the school district to turn over school records of students for which the plaintiff has submitted requests accompanied by proper disclosure authorizations, and to order the school district to fulfill promptly all future requests for records submitted by the plaintiff. Defendant Flint Community Schools resists the motion arguing that it is moot (it says that it furnished all the records requested, albeit after a long wait) and unripe (because administrative remedies were not exhausted), the defendant is not subject to the pertinent federal legislation (it says it is not a "facility" as defined by the laws), none of the students whose records were requested were subject to abuse or neglect (which, it says, is a prerequisite for requesting the records), the plaintiff cannot show irreparable harm, and an injunction would not serve the public interest. The Court heard oral argument on the motion on September 30, 2015 and permitted the parties to submit supplemental briefs. The plaintiff has shown that it is entitled to a

preliminary injunction to obtain the requested records because it likely will prevail on the merits, none of the school district's defenses is persuasive, and the other factors relevant to the consideration of preliminary injunctive relief favor the plaintiff.  The motion will be granted.

I.

Plaintiff Michigan Protection and Advocacy Service, Inc. describes itself as a non-profit Michigan corporation, designated by Michigan's governor as the state's protection and advocacy system with the responsibility to enforce and carry out federal mandates under the Protection and Advocacy for Individuals with Mental Illness Act of 1986 (PAIMI), the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (the DD Act), and the Protection and Advocacy of Individual Rights (PAIR) Program of the Rehabilitation Act of 1973, as amended. Congress passed those statutes (the "Protection and Advocacy Acts") "to ensure that the rights of individuals with mental illness are protected," and to "assist States to establish and operate a protection and advocacy system for individuals with mental illness which will . . . protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes," 42 U.S.C. § 10801(b); "to provide for allotments to support a protection and advocacy system . . . in each State to protect the legal and human rights of individuals with developmental disabilities in accordance with this part," 42 U.S.C. § 15041; and "to support a system in each State to protect the legal and human rights of individuals with disabilities" whose interests are not otherwise protected under either the PAIMI Act or the DD Act, 29 U.S.C. § 794e(a)(1).

The plaintiff alleges that, over the past year, it has been contacted by several parents of students at the Flint Community Schools who expressed concerns that their children with disabilities and special educational needs were not being served adequately by the district's special education

-2-

programs.  In order to review the adequacy and appropriateness of the education programming provided to those students, the plaintiff submitted to the school district a number of requests for educational and other records relating to its client/students.  In each case, the plaintiff provided to the district consent forms from the parents authorizing release of the requested records.  The complaint sets forth a list of record requests by the plaintiff to which the school district either failed or refused to provide any timely response, including four requests filed in March and April 2015 that the district had either ignored or responded to only in part, as of July 10, 2015, when the complaint was filed.  The complaint also describes four requests originally sent in October and November 2014, as to which the plaintiff filed due process complaints through the Michigan Administrative Hearing System in order to compel disclosure of the requested records.  Those requests ultimately were fulfilled between March and April 2015, when the district finally agreed to provide the requested records, after delaying the requested disclosures for between five and six months during the pendency of the administrative proceedings.

The plaintiff asserts that its mission of advocating for the rights of disabled students attending the defendants' schools (to ensure that those students receive adequate services) has been frustrated repeatedly by the failure or refusal of the school district to disclose educational records in a timely manner.  It asserts that, in the cited cases, the plaintiff could not conduct a proper evaluation of the special education services offered to its clients for most of an entire school year, leaving those students potentially to suffer with inadequate or inappropriate services, and causing them to have even greater difficulties in their learning.

The plaintiff filed its complaint on July 10, 2015, and its motion for a preliminary injunction on July 13, 2015.  The defendants filed a response to the motion and the plaintiff filed a reply.  The

-3-

Court scheduled a prompt hearing, which was adjourned once at the request of the parties.  The Court heard oral argument and allowed supplemental briefing.

## II.

### A.

The criteria for obtaining a preliminary injunction are well known and undisputed by the parties.  The relevant factors are whether (1) the moving party has demonstrated a substantial likelihood of success on the merits; (2) the moving party will suffer irreparable injury without the injunction; (3) the preliminary injunction will cause substantial harm to others; and (4) the public interest will be served if the injunction issues.  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  Although these factors are to be balanced, the failure to show a likelihood of success on the merits is generally fatal.  *Ibid.*; *see also Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).  Rule 65 of the Federal Rules of Civil Procedure authorizes the issuance of preliminary injunctions and temporary restraining orders when appropriate.  It is appropriate here.

*First*, the plaintiff has established that it likely will succeed on the merits of its claims.  The legislation in question indisputably creates a right in an organization like the plaintiff to the records it seeks.  It is undisputed that the plaintiff is a state advocacy system established to advocate the rights of students with mental illnesses and developmental disabilities.  The Protection and Advocacy for Individuals with Mental Illness (PAIMI) Act, Pub. L. 99-319, states that such a protection and advocacy system "shall . . . have access to all records of [] any individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access."  42 U.S.C. §

-4-

10805(a)(4)(A).  "[T]he term 'records' includes reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents."  42 U.S.C. § 10806(b)(3)(A).  Although the definition of the term "records" in section 10806 is preceded by the phrase "in this section," the Third Circuit has held that "the definition of 'records' in § 10806 controls the types of records to which [a state advocacy system] 'shall have access' under § 10805 because § 10805 provides that an eligible system 'shall . . . in accordance with section 10806 of this title, have access to' certain records."  *Pennsylvania Prot. & Advocacy, Inc. v. Houstoun*, 228 F.3d 423, 426 n.1 (3d Cir. 2000).  That construction is sound.  The phrase "care and treatment" is defined under the applicable regulation as meaning "services provided to prevent, identify, reduce or stabilize mental illness or emotional impairment such as mental health screening, evaluation, counseling, biomedical, behavioral and psychotherapies, supportive or other adjunctive therapies, medication supervision, special education and rehabilitation, even if only 'as needed' or under a contractual arrangement."  42 C.F.R. § 51.2.

Regulations enacted under the authority of the PAIMI Act require that "[a]ccess to records shall be extended *promptly* to all authorized agents of a P&A system," 42 C.F.R. § 51.41(a) (emphasis added), and "[a] P&A [Protection and Advocacy] system shall be permitted to inspect and copy records, subject to a reasonable charge to offset duplicating costs," 42 C.F.R. § 51.41(e).

The Developmental Disabilities Assistance and Bill of Rights Act of 2000 (the "DD Act"), Pub. L. 101-496, states that P&A Systems "shall . . . have access to all records of [] any individual with a developmental disability who is a client of the system if such individual, or the legal guardian,

conservator, or other legal representative of such individual, has authorized the system to have such access." 42 U.S.C. § 15043(a)(2)(I)(i). "[T]he term 'record' includes [] a report prepared or received by any staff at any location at which services, supports, or other assistance is provided to individuals with developmental disabilities." 42 U.S.C. § 15043(c)(1).

Regulations enacted under the DD Act authorize a P&A System and its agents to "have access to the records of individuals with developmental disabilities [if] authorized by an individual who is a client of the system, or who has requested assistance from the system, or by such individual's legal guardian, conservator or other legal representative." 45 C.F.R. § 1386.25 (eff. date Aug. 26, 2015). That includes records created for "intake, assessment, evaluation, education, training and other services[,] supports or assistance, including medical records, financial records, and monitoring and other reports prepared or received by a service provider." 45 C.F.R. § 1386.25(b)(1).

Except in cases where probable cause exists to believe that a developmentally disabled person's life or health are in serious immediate danger, "access to records of individuals with developmental disabilities shall be provided to the P&A system *within three business days* after the receipt of [] a written request from the P&A system," 45 C.F.R. § 1386.25(c)(2) (emphasis added), and the advocacy system "shall be permitted to inspect and copy information and records, subject to a reasonable charge to offset duplicating costs," 45 C.F.R. § 1386.25(d).

The Protection and Advocacy for Individual Rights (PAIR) Act provides for funding and defines the authority of state P&A Systems set up "to protect the legal and human rights of individuals with disabilities who [are] ineligible for protection and advocacy programs under subtitle C of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 [42 U.S.C.A. § 15041

-6-

*et seq.*] [and] are ineligible for services under the Protection and Advocacy for Mentally Ill Individuals Act of 1986 (42 U.S.C. 10801 *et seq.*) because the individuals are not individuals with mental illness, as defined in section 102 of such Act (42 U.S.C. 10802)." The PAIR Act gives such systems "the same general authorities, including the authority to access records and program income, as are set forth in subtitle C of title I of the Developmental Disabilities Assistance and Bill of Rights Act of 2000." 29 U.S.C. § 794e(f)(2).

Based on the facts stated in the complaint and those presented at the hearing — all of which appear to be undisputed — it is evident that the school district repeatedly and persistently has failed or refused to disclose records requested by the plaintiff within the time required under the applicable statutes and regulations. The PAIMI Act requires that access to records must be allowed "promptly." The DD Act requires that access to records must be furnished "within three business days" after the receipt of a written request. The school district does not dispute that it did not fully respond to the requests at issue for months, and that in several instances the plaintiff was compelled to file administrative due process complaints in order to secure access to the records that it sought. Notwithstanding the school district's claims that it now has disclosed all the requested records, it is plain that the level of "responsiveness" exhibited by the school district is not sufficient to qualify as either "prompt" or as meeting a three-business-day statutory deadline. The school district contends that it has made certain changes in its operations that should improve its ability to comply timely with the plaintiff's requests, but its performance history to date causes serious doubts to linger about whether those measures will prove adequate to ensure the district's prompt performance of its disclosure obligations on all occasions in the future.

*Second*, the plaintiff will suffer irreparable harm if it is not able to obtain the records necessary for it to pursue its mission. Although the defendants insist that they have supplied all the records requested, the plaintiff points out that no records relating to student J.J. have been disclosed by the district. Moreover, without some sort of prospective injunctive relief to guarantee timely access to the records of its clients, the plaintiff cannot promptly investigate its clients' concerns about the adequacy and appropriateness of the special education and related services provided by the school district. Those clients are at risk of suffering sufficient periods of inadequate education if access to their records is delayed for months on end. *Michigan Prot. & Advocacy Serv., Inc. v. Evans*, No. 09-12224, 2010 WL 3906259, at *5 (E.D. Mich. Sept. 30, 2010) ("Without access to the necessary records, Plaintiff suffers irreparable harm. Given the nature of the case, there is unquestionably no adequate remedy at law and a remedy in equity is warranted."); *State of Connecticut Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F. Supp. 2d 649, 653 (D. Conn. 2005) ("[A] protection and advocacy system's inability to meet its federal statutory mandate to protect and advocate the rights of disabled people [] constitutes irreparable harm.").

*Third*, the school district has not established that it will be seriously harmed by prospective injunctive relief requiring it to comply with the applicable statutory disclosure deadlines. The district contends that it will be impossible for it in all instances to respond to record requests from the plaintiff "within three days," because there are some periods during which its operations are suspended for extended periods during holidays and administrative closures. However, that concern can be addressed by appropriately tailored constructions of the terms "promptly" and "business days" in the Court's injunction to account for times when administrative personnel are not working.

-8-

Moreover, in arguing that its operations would be disrupted if it is required to comply with the statutory deadlines, the school district relies on nothing more than a vague assertion by Melinda Carroll, the district's Director of Learning Support Services and Special Programs, stating that "[i]f the District is required to provide copies of documents requested by [the plaintiff] within three business days under all circumstances, it will impact staffing for the District, would be unduly burdensome, and would change how the District conducts business." Def.'s Resp., Ex. A, Melinda Carroll aff. ¶ 18. The defendants, however, have not offered any specific facts to substantiate that contention, and it is facially contradicted by Ms. Carroll's representations that the school district only received thirty-five requests for records from the plaintiff over the entire past school year, and that a single recently-hired staff member of the district was able to fulfill all of the outstanding previously delayed requests within less than thirty days from the time she was hired, once she turned appropriate attention to the task.

*Fourth*, the Protection and Advocacy Acts embody compelling public interests that Congress expressed in the purpose of each enactment, which are "to ensure that the rights of individuals with mental illness are protected," and "to assist States to establish and operate a protection and advocacy system for individuals with mental illness which will [] protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes." 42 U.S.C. § 10801(b); *see also* 42 U.S.C. § 15041 ("The purpose of this part is to provide for allotments to support a protection and advocacy system . . . in each State to protect the legal and human rights of individuals with developmental disabilities in accordance with this part."). Those purposes thoroughly are frustrated when the efforts of the agency designated to advocate for the rights of mentally ill and developmentally disabled individuals in the State of Michigan are stymied

for months on end by the defendants' failure or refusal to disclose essential records that are needed to allow the advocacy agency and its clients to determine the adequacy and appropriateness of the special education and other services provided by the district to its disabled students.

## B.

The defendants contend that the plaintiff's claims are moot because it has furnished all the records requested. Aside from the fact that one record remained to be produced at the time of the hearing on the present motion, the defendant's argument misapprehends the import of the plaintiff's complaint. It is not simply that the records should be produced, but that they be produced *promptly*. "The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties." *McPherson v. Michigan High School Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc) (citation omitted). An injunction mandating that the defendant furnish the records within the time contemplated by the Protection and Advocacy Acts would "make a difference."

In addition, the defendant's voluntary but tardy compliance with the record requests cannot moot the controversy. The doctrine of voluntary cessation applies here. Generally, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case." *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (internal quotation marks and citation omitted); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953); *Ammex, Inc. v. Cox*, 351 F.3d 697, 704 (6th Cir. 2003). When a defendant voluntarily ceases the allegedly illegal conduct, the case is not moot unless two conditions are met: "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis*, 440

-10-

U.S. at 631 (1979) (ellipsis, internal quotation marks, and citations omitted).  Neither of the conditions are met here.  Past conduct indicates that prompt compliance with future records requests is far from certain.  And nothing has "eradicated" the problems caused by the tardy production of the records of the plaintiff's clients.

C.

The defendants also contend that the plaintiff's remedies fall within the scope of the Individuals With Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (IDEA), which was enacted to ensure that a "free appropriate public education [FAPE] is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school."  20 U.S.C. § 1412(a)(1)(A).  Because the plaintiff has not exhausted the administrative remedies available under the IDEA, the defendants argue, the plaintiff's present claims are not ripe.

However, as the plaintiff correctly points out, it has not filed any claim under the IDEA; any exhaustion requirement under that act therefore is immaterial.  *See Michigan Prot. & Advocacy Serv., Inc. v. Evans*, No. 09-12224, 2010 WL 3906259, at *3 (E.D. Mich. Sept. 30, 2010).  Instead, the plaintiff filed suit to enforce its rights under the Protection and Advocacy Acts via 42 U.S.C. § 1983.  "[E]xhaustion of state administrative remedies [is not] required as a prerequisite to bringing an action pursuant to § 1983."  *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982).  It is true that the PAIMI Act imposes a limited obligation on a protection and advocacy system to make some efforts to pursue administrative remedies before filing suit:

> Prior to instituting any legal action in a Federal or State court *on behalf of an individual with mental illness*, an eligible system . . . shall exhaust in a timely manner all administrative remedies where appropriate. If, in pursuing administrative remedies, the system . . . determines that any matter with respect to such individual

-11-

> will not be resolved within a reasonable time, the system, agency, or organization
> may pursue alternative remedies, including the initiation of a legal action.

42 U.S.C. § 10807(a) (emphasis added). As the plain language of that provision establishes, this limited exhaustion requirement only applies where the advocacy organization pursues a claim on behalf of a particular individual. Here, the plaintiff has instituted an action on its own behalf alleging that the defendants systematically have denied the plaintiff its right to timely access to its clients' educational records, as guaranteed by the Protection & Advocacy Acts. Moreover, even if the PAIMI exhaustion requirement does apply in this case, it plainly was satisfied when the plaintiff "attempted to request the pertinent records [of its clients], and [the defendants] declined to provide them." *Prot. & Advocacy For Persons With Disabilities v. Armstrong*, 266 F. Supp. 2d 303, 312-13 (D. Conn. 2003) (holding that the P&A system had standing to bring suit under 42 U.S.C. § 1983 with no requirement for administrative exhaustion, and any requirement for exhaustion under PAIMI had been satisfied when the P&A system's requests were denied or ignored).

Finally, the statute permits a protection and advocacy system to forego administrative remedies and proceed directly to litigation if it "determines that any matter . . . will not be resolved within a reasonable time." Based on the facts alleged in the complaint, which largely are undisputed, the defendants delayed for months responding to the record requests filed by the plaintiff, including in cases in which the plaintiff did file administrative due process complaints. Under the circumstances, the plaintiff fully was justified in concluding that its record access disputes were not being resolved, and would not be resolved "within a reasonable time." 42 U.S.C. § 10807(a). The defendants were unable or unwilling, on repeated occasions, to complete any satisfactory response to the plaintiff's record requests in a timely manner, and they therefore

-12-

forfeited any right they had to handle the resulting record access disputes with the plaintiff exclusively through administrative channels.

In a supplemental brief, the defendants argue that the Sixth Circuit's decision in *Fry v. Napoleon Community Schools*, 788 F.3d 622 (6th Cir. 2015), compelled the plaintiff to proceed through administrative channels before filing its complaint in this Court. In *Fry*, the plaintiffs — a disabled child and her parents — sued a school district under the Americans with Disabilities Act and the Rehabilitation Act when school officials refused to allow the student to bring her service dog to school. The student's Individualized Education Program (IEP) called for her to have a human aide, which the school provided. The court of appeals held that even when invoking other federal statutes in their lawsuits, "plaintiffs must exhaust IDEA procedures if they seek 'relief that is also available' under IDEA, even if they do not include IDEA claims in their complaint." 788 F.3d at 625 (citations omitted). The court explained that plaintiffs, therefore, must resort first to IDEA's administrative procedures "when the injuries alleged can be remedied through [those] procedures, or when the injuries relate to the specific substantive protections of the IDEA." *Ibid.* The court then reasoned:

> The core harms that the Frys allege arise from the school's refusal to permit [the student] to attend school with [her dog] relate to the specific educational purpose of the IDEA. The Frys could have used IDEA procedures to remedy these harms. Therefore, the nature of the Frys' claims required them to exhaust IDEA procedures before filing suit under the ADA and the Rehabilitation Act.

*Ibid.*

In this case, the relief the plaintiff seeks — timely production of students' records — is not "also available" under IDEA. It may be that some of the plaintiff's clients have been denied a FAPE, as guaranteed by the IDEA. But that is not the plaintiff's core claim here. Instead, the

-13-

plaintiff alleges that it has been systematically denied timely access to the educational records of its clients that were needed for the plaintiff to determine the appropriateness and adequacy of the educational services that they receive. The school district has not identified any provision in the IDEA that would allow the plaintiff to seek, or an administrative law judge to award, the injunctive relief that the plaintiff wants, which is an order requiring the district to comply in all instances with the statutory disclosure deadlines under the Protection and Advocacy Acts. *Fry*'s reasoning, therefore, does not apply here.

As a case in point, the plaintiff attached to its reply two decisions of administrative law judges holding that they had no authority to consider or address alleged systemic failures by a school district to provide appropriate services or maintain adequate records. It is those systemic failures to which the complaint here is directed. The plaintiff complains that it could not even begin in a timely manner properly to assess whether its clients were denied a FAPE. Access to those records likely would precede the administrative remedies that the defendants insist should be exhausted. The defendants' ripeness argument puts the cart before the horse. The plaintiff's claim here is properly sequenced within the scheme of administrative procedures and court remedies.

D.

The defendants argue that they are exempt from the record access provisions of the Protection and Advocacy Acts because the school district is not a "facility" as that term is defined under the DD Act and its implementing regulations. That argument, even if valid, is life limited; effective August 26, 2015, the relevant regulatory language was amended to eliminate the use of the term "facility" in the record access provisions and replace all uses of that term with the phrase "service provider." Developmental Disabilities Program Final Rule, 80 Fed. Reg. 143, at 44,796

-14-

(July 27, 2015) (eff. date Aug. 26, 2015) (commenting that the change in terminology honors the intent of the DD Act amendments passed by Congress in 2000, which "strengthen[ed] provisions regarding access to records of individuals with developmental disabilities that service providers hold, in order to investigate potential abuse and neglect").   Although "service provider" is also an undefined term in the regulations, taking its ordinary meaning, the district certainly "provides services" to students with mental or emotional illnesses, developmental disabilities, and other relevant conditions.   The school district affirmatively represents in its response that it is a participating education agency under the IDEA, and it therefore is required to provide, at a minimum, special education and "related services" to any mentally ill, disabled, or developmentally disabled students who attend its schools.   Therefore, it qualifies as a "service provider" subject to the disclosure requirements under the DD Act.

Moreover, even as to the past requests to which the old regulatory language applied, decisions of other circuits on point have held that a school district qualifies as a "facility" subject to the DD Act's disclosure provisions, even if it does not provide "residential" services to students. *Connecticut Office of Prot. & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 240 (2d Cir. 2006) ("[T]he Academy is a school that provides a therapeutic educational program for students who are seriously emotionally disturbed.  It is therefore a facility to which OPA must have reasonable access under PAIMI.").  The defendant school district falls within the scope of the regulations, both old and new.

E.

The defendants also argue that the plaintiff is not entitled to the records it seeks because it has not alleged that any of the named students were subjected to abuse or neglect.  But that argument

-15-

disregards the plain language of the record disclosure provisions, which contemplate broad access to all records, whether or not any allegations of abuse have been made. The statutory provisions at issue separately grant the plaintiff (1) the authority to investigate allegations or complaints of abuse and neglect, by a number of appropriate means, including on-site inspections and interviews of individuals, 42 U.S.C. § 10805(a)(1)(A); 42 U.S.C. § 15043(a)(2)(B); and (2) to have access to "all records [] of any individual with a developmental disability who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access," 42 U.S.C. § 15043(a)(2)(I)(i); 42 U.S.C. § 10805(a)(4). By the plain terms and structure of those statutes, the "access to records" provisions are not cabined by the "abuse or neglect" provisions, and the right to access records therefore is not restricted in scope to the records only of clients of the plaintiff who have allegedly been abused or neglected. *See Connecticut Office of Prot. & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 240-41 (2d Cir. 2006) (rejecting a similar argument because it "would render [§ 15043(a)(2)(I)(i)] meaningless because it would authorize only those activities authorized by [§ 15043(a)(2)(B)]"). *Hartford* construed the extent of the provision granting access to individuals for interviews, 42 U.S.C. § 15043(a)(2)(H), but its reasoning directly applies with equal force to the immediately adjoining parallel access to records provision in subsection (I), and to the congruent provisions under 42 U.S.C. § 10805(a).

## III.

The relevant factors all favor the issuance of a preliminary injunction commanding the defendants to furnish records requested previously under the Protection and Advocacy Acts, and

-16-

requiring the defendants to comply with future requests within the time limits prescribed by those statutes and regulations.

Accordingly, it is **ORDERED** that the plaintiff's motion for a preliminary injunction [dkt. #5] is **GRANTED**.

It is further **ORDERED** that defendants Flint Community Schools and Larry Watkins, Jr., its interim superintendent, their agents, servants, employees, attorneys and all those in active concert and participation with them who receive actual notice of this order, are commanded:

A.   To furnish forthwith to the plaintiff the school records requested in its March 31, 2015 outstanding records request letter for student/client J.J.;

B.   To respond to any records requests made during the pendency of this litigation by providing access to the records of any individual with a developmental disability, as defined under the DD Act, within three business days after the receipt of a written request from the plaintiff, 45 C.F.R. § 1386.25(c)(2); and

C.   In all other cases, to provide access to the records of any individual with a condition covered under the PAIMI Act or PAIR Act within five business days (*see* 42 C.F.R. § 51.41(a), requiring that access be provided "promptly").

For the purpose of this mandatory injunction, the term "business days" excludes any day on which the school district's facilities are closed to students and the public and its administrative staff are not required to work, due to a holiday or administrative closure.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   November 23, 2015

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 23, 2015.

s/Susan Pinkowski
SUSAN PINKOWSKI